**In the Matter of the Lawful Gambling License of HENRY YOUTH HOCKEY ASSOCIATION, LICENSE NO. 02795.**

**No. C9–93–1437.**

Court of Appeals of Minnesota.

Jan. 25, 1994.

Review Granted in Part April 22, 1994.

Kevin Patrick Staunton, Caroline A. Simenson, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for relator Henry Youth Hockey Assn.

Hubert H. Humphrey, III, Atty. Gen., John Steven Garry, Asst. Atty. Gen., St. Paul, for respondent Minnesota Gambling Control Bd.

Considered and decided by ANDERSON, C.J., and KALITOWSKI and FLEMING *, JJ.

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

ANDERSON, Judge.

The Minnesota Lawful Gambling Board (Board) ordered that relator Henry Youth Hockey Association (Association) was ineligible to obtain a permit to conduct lawful gambling at a Minneapolis supper club for 12 months. The Board later adopted an administrative law judge's findings that the Association had engaged in a pattern of willful violations of law and Board rule. The Board then (1) revoked the Association's lawful gambling license, (2) imposed a $1,500 civil penalty, and (3) held that if certain members of the Association were to act together or individually to form or participate in the formation of another organization, that organization would be ineligible to receive a gambling license from the Board. By writ of certiorari, the Association challenges the Board's decision. We affirm in part and reverse in part.

## FACTS

The Henry Youth Hockey Association is a Minnesota nonprofit corporation founded to support youth hockey teams in North Minneapolis. The Association is comprised of parents whose children play hockey and it sponsors from three to seven hockey teams annually. Before 1988, the Association's members raised from $3,000 to $4,000 annually from registration fees, fundraisers, and solicitations. The Association used the money primarily for ice time and equipment purchases.

In 1988, Brad Knuth was president and William Hurley was treasurer of the Association. Early that year, Steven Peterson, a friend of Knuth, suggested that the Association obtain a lawful gambling license to increase its revenues. The Association hired Peterson as gambling manager to manage pull-tab sales and occasional raffles for the Association. Peterson's duties included hiring necessary employees, collecting funds, filing tax documents, negotiating leases, and performing all other gambling-related duties.

In June 1988, the Association filed an application for a lawful gambling license and on August 1, 1988, the Association received its first license from the Board to conduct lawful gambling. With its lawful gambling license applications, the Association completed and filed forms setting forth the system of internal controls for its lawful gambling operations, including the structure and purpose of its gaming committee. The forms only listed the Association's president, treasurer, and gambling manager as committee members. The forms filed by the Association with its license application were signed by the Association president. Instead of instituting the internal controls described in the applications and forms, the Association gave its gambling manager complete and exclusive control over its lawful gambling operations and funds. Peterson did not give Association members financial reports or written accountings at monthly meetings, but orally reported that gambling was raising in excess of $1,000 monthly.

In 1989, the Minneapolis Police Department Licensing Unit conducted a routine annual review of the Association's gambling records. The department found that the Association had not sufficiently documented the sources of its bank deposits, was unable to account for all winning tickets, filed inaccurate tax forms, maintained inaccurate written documentation for expenditures, and failed to use dual signature controls for cash disbursements.

The department's findings and recommendations were sent to the Board of Directors of the Association and were received by Peterson. It is unclear, however, if this correspondence was actually distributed to anyone within the Association other than Peterson. Peterson did mention the review at a monthly board meeting, but reported that, with the exception of "a few little discrepancies," everything was fine and the Association "passed" its "audit."

In June 1989, Robert Teachman (an officer, team manager, and active member in the Association), Knuth and another unidentified Association member decided Peterson should be dismissed because he was not pursuing new gambling sites. Teachman took over Peterson's duties. After reviewing the gambling records, Teachman estimated that approximately $33,700 was "missing" and concluded that monthly tax reports were not being filed. The Association reported the suspected theft of funds to the Minneapolis Police Department. The police department requested that the Association obtain an independent audit of its gambling records. The audit revealed that the Association had cash shortages of $98,727.49.

Teachman served as gambling manager for approximately one year, when his duties were assumed by Hurley. Under Teachman's tenure, the Association made over $1 million in gambling sales. In January 1991, the Minneapolis Police Department conducted a second review of the Association's gambling records and found that during Teachman's tenure, the Association's expenditures were not properly recorded, expenditures were not adequately documented, there were no receipts for lawful-purpose donations, and unauthorized "bar loans" were made to individuals.

The Minnesota Department of Revenue subsequently audited the Association's records and uncovered cash shortages of $117,-376 for the year ending July 31, 1989. The Department of Revenue notified the Board of the audit results.

Once the Board received the audit results, it issued a Statement of Charges in which it alleged that the Association willfully (1) failed to deposit or account for $117,376 in gambling receipts, (2) failed to expend the undeposited funds for lawful purposes or allowable expenses, (3) failed to maintain records accounting for its assets, liabilities, and fund balances, and (4) failed to properly account for its assets or to discover that large sums were not deposited. Further, it alleged that another organization had engaged in illegal gambling at one of the Association's permitted sites.

The police department then conducted a third review of the Association's gambling records. This review showed that, while the Association was improving in its compliance with the gambling statutes and rules, the

Association still failed to document lawful-purpose donations and allowable expenses.

On July 7, 1993, the Board affirmed the administrative law judge's grant of summary disposition with respect to the illegal gambling at one of the Association's permitted sites, ordered the Association to pay a civil penalty of $1,500, revoked the Association's lawful gambling license, ruled that the Association was ineligible to obtain a premises permit to conduct lawful gambling at a Minneapolis supper club for 12 months, and held that, if Association members who have served as its chief executive officer, director(s), officer(s), or gambling manager since the Association was first licensed were to act together or individually to form another organization, that organization would be ineligible to receive a lawful gambling license from the Board.

## ISSUES

I. Did the Board err as a matter of law in concluding that the Association engaged in a pattern of willful violations of law and Board rule within the meaning of Minn.Stat. § 349.16, subd. 1 (1988)?

II. Did the Board abuse its discretion in revoking the Association's lawful gambling license?

III. Did the Board improperly order that if certain members of the Association were to act together or individually to form or participate in the formation of another organization, that organization would be ineligible to receive a gambling license?

## ANALYSIS

### I.

■ A party seeking review has the burden of proving that an agency decision is affected by error of law, is unsupported by substantial evidence in view of the entire record as submitted, or is arbitrary and capricious. *Markwardt v. State*, 254 N.W.2d 371, 374 (Minn.1977).

Although reviewing courts are not bound by an agency's interpretation of the law, "an agency's interpretation of the statutes it administers is entitled to deference and should be upheld, absent a finding that it is in conflict with the express purpose of the Act and the intention of the legislature." *Geo. A. Hormel & Co. v. Asper*, 428 N.W.2d 47, 50 (Minn.1988). In accordance with that principle, this court has stated that when an agency makes a reasonable interpretation of a statute, it is not the role of this court to change that interpretation. *In re Hyman Freightways, Inc.*, 488 N.W.2d 503, 505 (Minn.App.1992) (it is the role of the legislature or the supreme court to change a reasonable interpretation of a statute made by an agency).

The legislature has provided for the regulation of lawful gambling "to prevent its commercialization, to ensure integrity of operations, and to provide for the use of net profits only for lawful purposes." Minn.Stat. § 349.11 (1992). The legislature created a gambling control board to oversee lawful gambling. Minn.Stat. § 349.151, subd. 1 (1992). Among other things, the Board is authorized to ensure that lawful gambling is conducted in the public interest. Minn.Stat. § 349.151, subd. 4(a)(1) (1992). When licensed organizations violate statutes and rules regarding lawful gambling, the Board is authorized to suspend or revoke offending organizations' licenses or premises permits. Minn.Stat. § 349.151, subd. 4(a)(12) (1992).

In 1988 and 1989, the Board was authorized to suspend organizational licenses for violations of law or Board rules or to revoke those licenses if the Board found a "pattern of willful violations." Minn.Stat. § 349.16, subd. 1 (1988). The statute required that in any disciplinary proceeding against a licensed organization, the Board must first determine whether the organization violated a law or Board rule, and if multiple violations are found, then determine whether the violations constitute a pattern of willful violations which would authorize the Board to revoke rather than to suspend the license. *Id.* The Board charged the Association with engaging in a pattern of willful violations of law and Board rule that authorized the revocation of the Association's license pursuant to Minn.Stat. § 349.16, subd. 1 (1988). In its July 7, 1993 order, the Board determined that the Association's "continued and careless disre-

gard of the governing rules and statutes" represented a pattern of willful violations.

The Association argues that it did not willfully violate the law and Board rules. In many instances, the courts have defined "willful" as a disregard for governing statutes and an indifference to their requirements, or a careless disregard of statutory requirements. *See United States v. Illinois Centr. R.R. Co.*, 303 U.S. 239, 242–43, 58 S.Ct. 533, 535, 82 L.Ed. 773 (1938) (quoting *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933)); *TransWorld Airlines, Inc. v. Thurston*, 469 U.S. 111, 127, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985); *Cox v. United States Dept. of Agriculture*, 925 F.2d 1102, 1105 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 178, 116 L.Ed.2d 141 (1991). In this case, the Board followed that definition to find that willful violations include those done with careless disregard of legal requirements. We find this definition persuasive.

As stated above, when the Association was initially licensed, Knuth, the Association's president, signed the forms submitted in connection with the Association's application to conduct lawful gambling. The requirement that the Association must have a "gaming committee" composed of "at least four active members to handle and oversee" the lawful gambling operations was contained on the forms. The gaming committee was required to review and establish internal accounting and administrative controls to ensure the integrity of the Association's gambling, to ensure that all expenditures were for lawful purposes and properly authorized, and to establish bank accounts requiring the signature of the president, the treasurer, and the gambling manager. Minn.Stat. § 349.16, subd. 1 (1988).

Because the Association's officers and the gambling manager carelessly disregarded these requirements, we conclude that they engaged in a pattern of willful violations of law and Board rule. The record supports the Board's findings that: (1) the gambling manager failed to comply with expenditures and accounting requirements; (2) the president failed to monitor the gambling manager's activities or comply with the required gaming committee structure and internal controls governing the Association's receipts; (3) the treasurer failed to take any steps to determine how the gambling monies should be monitored and protected; and (4) other principals, including the gambling manager, the Association's officers, and certain active members also acted in careless and willful disregard of legal requirements and in complete indifference to the Association's responsibilities. With proper internal controls, the theft of the gambling funds could have been avoided or limited.

The Association argues that the organization is not responsible for the violations of law and Board rules committed by its principals and that the principals' illegal actions should not be imputed to the organization. We disagree. The willful violations of an artificial entity's officers and employees can be imputed to an entity such as the Association. *See, e.g., United States v. Cincotta*, 689 F.2d 238 (1st Cir.), *cert. denied*, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). In this case, the Association officers carelessly disregarded governing statutes and rules and were completely indifferent to legal requirements. The Association may not abdicate its statutory and rule responsibilities or plead ignorance of legal requirements by delegating all of its legal responsibilities to an employee. *Sabes v. City of Mpls.*, 265 Minn. 166, 177, 120 N.W.2d 871, 878 (1963). We conclude that the Association engaged in a pattern of willful violations of law and Board rule.

## II.

The Association argues that the Board did not act within the Board's discretionary authority in revoking the Association's lawful gambling license. An administrative agency's assessment of penalties or sanctions is an exercise of its discretionary power. *In re Haugen*, 278 N.W.2d 75, 80 n. 10 (Minn.1979). A reviewing court, therefore, may not interfere with the penalties or sanctions imposed by an agency decision unless a clear abuse of discretion is shown by the party opposing the decision. *See In re Minn. Tipboard Co.*, 453 N.W.2d 567, 569

(Minn.App.), *pet. for rev. denied* (Minn. May 30, 1990).

Given that the Association engaged in a pattern of willful violations of law and Board rule, the Board had explicit authority to revoke the Association's gambling license. Minn.Stat. § 349.16, subd. 1 (1988). Further, the Board has a statutory duty "to regulate lawful gambling to ensure it is conducted in the public interest." Minn.Stat. § 349.151, subd. 4(a)(1) (1992). In deciding whether to revoke a license, the function of an agency with protective duties such as those entrusted to the Board is not only to consider the licensee's acts, "but also the harm to the public if such acts remain unpunished and the deterrent effect upon others of a severe penalty." *Padilla v. Minnesota State Bd. of Medical Examiners,* 382 N.W.2d 876, 887 (Minn.App.1986), *pet. for rev. denied* (Minn. April 24, 1986). In view of these specific statutory purposes and duties and the severity of the Association's violations, we conclude that the Board did not abuse its discretion in revoking the Association's lawful gambling license.

### III.

The Association argues that the Board exceeded its statutory authority and violated due process by ordering that if certain Association members were to act together or individually to form or participate in the formation of another organization, that organization would be ineligible to receive a lawful gambling license. The Association takes issue with paragraph 5 of the Board's order, which states:

> (5) If any of the members of Respondent who have served as its chief executive officer, director(s), officer(s), or gambling manager since Respondent was first licensed by the Board to conduct lawful gambling act together or individually to form or participate in the formation of another organization, that organization shall not be eligible to receive a gambling license from the Board.

■ The Association first argues that the Board has no authority to impose this limitation. We disagree. As noted previously, the Board's express statutory authority includes not only license revocation, but also the duty to take all necessary steps to insure the integrity of, and public confidence in, lawful gambling and the duty to regulate lawful gambling to ensure it is conducted in the public interest. Minn.Stat. § 349.151, subd. 4(a)(1), (15) (1992). The Board apparently intended to block circumvention of the license revocation by limiting the Association officials' participation in the formation of new organizations. Given its broad disciplinary authority, the Board has the authority to impose this restriction on an organization if certain Association members acted together or individually to form that organization. *See Haugen,* 278 N.W.2d at 75, 80 n. 10 (agency's assessment of penalties and sanctions is an exercise of a discretionary grant of power, which may not be disturbed by a reviewing court absent an abuse of discretion). We conclude that this action was within the statutory authority of the Board and was not an abuse of its discretion.

■ The Association also argues that the Board's order denies procedural due process. We agree. The essence of due process is the opportunity to be heard at a meaningful time in a meaningful manner. *See, e.g., Eisen v. State,* 352 N.W.2d 731, 736 (Minn.1984).

The Board issued an amended notice of and order for hearing. *See* Minn.Stat. § 349.151, subd. 4 (1991) and Minn.R. 7860.-0600 (1991). In the notice, the Board stated:

> The hearing in this matter will be held for the purpose of determining whether the allegations contained in the Statement of Charges * * * are true and, if so, *whether the Board shall revoke, suspend and/or impose a civil penalty against Respondent's lawful gambling license and/or premises permit.* (Emphasis added.)

The Board directed the notice be served on "all parties" but only designated the Board and the Association as parties. Further, the notice limited the purpose of the hearing to determination of the truth of the allegations in the Statement of Charges and to whether the Board shall revoke, suspend and/or impose a civil penalty against the Association's lawful gambling licenses and/or premises permit. The notice's language is insufficient

to provide adequate notice to those parties affected by the penalty imposed by the Board and did not provide adequate notice of that penalty.

Because the Board's notice was inadequate, all of the potentially affected parties did not receive proper notice of the hearing. *See* Minn.Stat. § 14.58 (1992) (in any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice). Paragraph 5 of the Board's order is, therefore, reversed.

## DECISION

The Minnesota Lawful Gambling Control Board properly found that the Association engaged in a pattern of willful violations of law and Board rule. The Board properly revoked the Association's lawful gambling license. The Board does have the authority to order that if certain members of the Association act together or individually to form or participate in the formation of another organization, that organization would be ineligible to receive a lawful gambling license. The Board failed to provide adequate notice; therefore, paragraph 5 of its order making certain organizations ineligible to receive a lawful gambling license is reversed.

**Affirmed in part and reversed in part.**